[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of E. Ohio Gas Co.,* Slip Opinion No. 2014-Ohio-3073.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-3073

IN RE APPLICATION OF EAST OHIO GAS COMPANY, D.B.A. DOMINION EAST OHIO, FOR APPROVAL OF TARIFFS TO ADJUST ITS AUTOMATED-METER-READING COST-RECOVERY CHARGE TO RECOVER COSTS INCURRED IN 2011; EAST OHIO GAS COMPANY, D.B.A. DOMINION EAST OHIO, APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of E. Ohio Gas Co.,* Slip Opinion No. 2014-Ohio-3073.]**

*Public utilities—Recovery of costs associated with automated-meter-reading program—Commission's decision to reduce recovery of costs was unreasonable—Order affirmed in part and reversed in part.*

(No. 2012-2117—Submitted May 14, 2014—Decided July 16, 2014.)

APPEAL from the Public Utilities Commission of Ohio, No. 11-5843-GA-RDR.

_____

**PFEIFER, J.**

**{¶ 1}** The East Ohio Gas Company, d.b.a. Dominion East Ohio ("Dominion" or "DEO"), appeals an order of the Public Utilities Commission

reducing Dominion's proposed customer charge to recover costs associated with Dominion's automated-meter-reading ("AMR") program. The commission reduced Dominion's proposed AMR charge—from $0.54 per customer per month to $0.42 per customer per month—ostensibly because Dominion had failed to timely implement the AMR program. The reduction, according to Dominion, prevents Dominion from recovering from customers approximately $1.6 million in costs associated with the program.

{¶ 2} On appeal, Dominion argues that the commission's order should be reversed because (1) the order is not supported by evidence in the record, (2) the order is unreasonable, (3) the commission lacks statutory and constitutional authority to issue retroactive orders that alter the significance of a utility's previous conduct, and (4) the order is barred by collateral estoppel. Dominion also argues that the commission erred by denying Dominion's motion for a stay of its order pending appeal.

{¶ 3} For the reasons explained more fully below, we agree that the commission's order is substantively unreasonable. Accordingly, we reverse the commission's order and remand this case for further proceedings, consistent with this opinion.

## I. Factual and Procedural Background

### A. Dominion's application to recover AMR program costs

{¶ 4} On December 7, 2006, the commission's minimum gas-service standards took effect, which required natural-gas companies to, among other things, make reasonable attempts to obtain actual readings of customers' meters every other month. *See* Ohio Adm.Code 4901:1-13-04(G)(1). Readings taken by AMR equipment qualified as "actual" readings, but readings taken by remote-meter-index equipment—the equipment then utilized by Dominion—did not qualify as "actual" readings. *Id.* Consequently, in December 2006, Dominion

filed an application to recover costs associated with implementing an AMR-installation program.

**{¶ 5}** By installing AMR devices—small electronic modules—on customers' existing gas meters, Dominion employees could then drive through neighborhoods collecting actual gas-meter readings through mobile data collectors installed in the employees' vehicles. Before the installation of AMR devices, Dominion meter readers walked routes and had to access the inside of some of Dominion's customers' premises in order to obtain an actual gas-meter reading. Thus, AMR technology offered accurate gas-meter readings without the inconvenience of a meter reader accessing the inside of a customer's property.

**{¶ 6}** In its AMR application, Dominion estimated that installing AMR devices on all of its meters would cost between $100 million and $110 million and would take as long as 15 to 20 years to complete if it were paid for through its normal budgeting process. To speed up the installation, Dominion applied for an automatic adjustment mechanism under R.C. 4929.11, which would allow Dominion to install AMR equipment on all of its meters over a five-year period by funding an accelerated installation program through an AMR-cost-recovery charge, or "AMR charge," to each customer per month. Dominion proposed a process whereby it would file an application in February of each year seeking the commission's approval for its proposed yearly AMR charge, which was to be based on the costs accumulated in the prior year for implementing the AMR program.

**{¶ 7}** The AMR charge was also meant to reflect the savings achieved as a result of using AMR devices. Because implementation of AMR equipment would reduce some of Dominion's operations and maintenance expenses—especially meter-reading and call-center costs—Dominion proposed to reduce the AMR charge by the amount of savings generated by the program. For example, after installation of AMR devices, Dominion could begin reducing its meter-

reader labor force because fewer meter readers would be necessary. The savings generated by the AMR program would be passed on to customers as a credit to the AMR charge.

## B. Ambiguity regarding the initial commencement date
## of the AMR program

{¶ 8} Dominion's AMR application was consolidated with a then pending rate case, and the commission did not ultimately approve the application until October 2008. The commission's order approving Dominion's application failed to specify expected commencement or completion dates for the program. Dominion has maintained that the program did not have a firm start date, but that it began, at the earliest, in January 2008, the date specified in its application. In contrast, the commission's staff has maintained that Dominion's AMR program began in January 2007. As support, the staff points to the facts that Dominion actually began installing AMR devices in 2007 and that Dominion filed a related application in a separate proceeding suggesting that its AMR program began in 2007. Thus, throughout this litigation, Dominion and the commission's staff have disagreed over when Dominion's five-year AMR program officially began and, therefore, when the five-year program should have been completed.

## C. The 2009 AMR order

{¶ 9} Once its plan was approved, Dominion was required to submit an application to the commission in February of each year justifying its yearly AMR charge based on the prior year's accumulated AMR expenses. In the first three AMR cases—determining charges based on costs incurred in 2008, 2009, and 2010, respectively—Dominion and the commission's staff ultimately agreed on the appropriate AMR charges. This appeal has resulted from Dominion's application to recover costs incurred in 2011, in which the commission's staff and Dominion could not agree on the AMR-charge rate. The merits of this appeal, however, turn on the meaning of an order that the commission issued in the

4

proceeding to recover the 2009 costs. For ease of reference, we refer to the order from the earlier proceeding as the "2009 AMR order," despite the fact that the proceeding occurred in 2010, because it determined the AMR charge to recover 2009 costs.

{¶ 10} In the proceeding to recover the 2009 costs, the commission's staff and Dominion agreed that the utility could charge $0.47 per customer per month to recover 2009 expenses. The Ohio Consumers' Counsel ("OCC"), however, objected to the agreed rate. After a hearing, the commission issued an opinion and order rejecting the OCC's arguments. But in its order, the commission also set forth the following instructions to Dominion regarding the timing of its AMR program:

> While the evidence in this case supports DEO's calculation, the Commission finds that DEO should be installing the AMR devices such that savings will be maximized and rerouting will be made possible in all of the communities at the earliest possible time. Therefore, the Commission expects that DEO's filing in 2011, for recovery of 2010 costs, will reflect a substantially greater number of communities rerouted. The Commission anticipates that, by the end of 2011, it will be possible to reroute nearly all of DEO's communities. To that end, the Commission finds that, in its 2011 filing, DEO should demonstrate how it will achieve the installation of the devices on the remainder of its meters by the end of 2011, while deploying the devices in a manner that will maximize savings by allowing rerouting at the earliest possible time.

2009 AMR order at 7, Pub. Util. Comm. No. 09-1875-GA-RDR (May 5, 2010).

{¶ 11} Consistent with the 2009 AMR order, Dominion, in its next application—to recover AMR costs incurred in 2010—submitted a plan indicating how it would install AMR devices on the remainder of its meters by the end of 2011. Dominion's plan also indicated that it would initiate rerouting in five service areas in 2011 and initiate rerouting in its final two service areas in 2012. Dominion and the commission's staff agreed that the appropriate rate to recover the 2010 costs should be $0.57 per customer per month, and the commission set the charge at the agreed rate.

### D. Terms of art: "installing" and "rerouting"

{¶ 12} "Installing" AMR devices and "rerouting" service areas are important concepts for this appeal, although neither party specifically defines the terms. "Installing" appears to mean accessing the customer's home or business to install the AMR device on the gas meter. The commission refers to "rerouting" as converting walking meter-reader routes into drive-by routes. Dominion disputes that "rerouting" is simply converting walking routes to driving routes and instead asserts that rerouting is "essentially a final fine-tuning of the meter-reading routes," which includes converting billing cycles and changing other internal processes. The parties agree, however, that "rerouting" a service area occurs *after* installation is mostly complete and that the rerouting process takes from one to three months.

### E. The present case: the 2011 AMR-charge proceeding

{¶ 13} In February 2012, Dominion filed its application to recover AMR costs incurred for 2011, requesting that its AMR charge be adjusted from $0.57 to $0.54. Dominion also reported that it had not completed installation of all AMR devices in 2011; it had 9,530 devices yet to install. As for rerouting, Dominion reported that it had rerouted eight of its eleven service areas by the end of 2011 and that it planned to reroute the remaining three areas in the first and second quarters of 2012. Unlike the previous three AMR-charge proceedings, Dominion

and the commission's staff could not reach agreement on the appropriate yearly AMR charge, and the matter proceeded to a hearing.

*1. The staff's argument: Dominion violated the 2009 AMR order*

**{¶ 14}** At the hearing, the staff argued that Dominion had missed its deadline to complete the AMR program by the end of 2011 and therefore violated the commission's 2009 AMR order. As a result, the staff recommended reducing Dominion's AMR charge to $0.42, the rate that the staff found Dominion could have charged if it had fully complied with the 2009 AMR order.

**{¶ 15}** To support its theory, the staff pointed primarily to the fact that Dominion's pace of AMR installations after 2009 had progressively slowed, which demonstrated that Dominion did not modify its installation practices in order to maximize savings at the earliest possible time, as directed by the commission in the 2009 AMR order. Specifically, the staff argued that if Dominion had continued its 2009 installation pace in years 2010 and 2011, it would have completed installation of all AMR devices in early August 2011. Assuming that Dominion would have needed two additional months to reroute its service areas, the commission's staff estimated that Dominion could have completed the rerouting process by the beginning of October 2011. And if Dominion had completed the rerouting process by that time, the staff argued that Dominion would have been able to report much more savings in 2011.

**{¶ 16}** To calculate the amount of those savings, the staff first concluded that if Dominion had completed its AMR program in October, it would have been able to immediately terminate 87 meter readers, which would have resulted in a monthly labor savings of $542,759. The commission's staff then multiplied that figure by three—for the months of October, November, and December—and determined that Dominion should have had an additional savings of $1,628,277 by the end of 2011. This additional $1,628,277 in savings would have reduced Dominion's 2011 AMR charge from $0.54 to $0.42.

{¶ 17} In sum, the staff argued that if Dominion had complied with the 2009 AMR order, it would have completed the AMR program by October 2011, which would have resulted in more savings by the end of 2011 and therefore a lower AMR charge.

2. *Dominion's argument: it did not violate the 2009 AMR order*

{¶ 18} Dominion argued that it had fully complied with the 2009 AMR order and that the staff had misconstrued the text and meaning of that order. According to Dominion, the 2009 AMR order did not expressly require it to complete installation and rerouting by the end of 2011—and certainly not by August or October of 2011, as determined by the staff. Dominion asserted that the staff's attempt to move the target completion date at such a late stage would be unfairly retroactive.

{¶ 19} Dominion also heavily criticized the staff's calculations for its proposed additional savings. Dominion claimed that it did not slow down its installation pace after 2009 but instead installed AMR devices as fast as it could. Dominion presented evidence attempting to show that the only remaining customers without AMR devices at the end of 2011 were either customers who had refused to allow Dominion access to their premises or large commercial customers who required special appointments to prevent business disruption. Further, Dominion argued that the staff's calculation did not take into account the increased costs of completing AMR installations at a faster pace.

3. *The commission agreed with its staff*

{¶ 20} In its October 3, 2012 opinion and order, Pub. Util. Comm. No. 11-5843-GA-RDR, 2012 Ohio PUC LEXIS 801 (Oct. 3, 2012) (the "underlying order"), the commission adopted the staff's recommended reduction in Dominion's AMR charge. Specifically, the commission found that Dominion's program term ended on December 31, 2011, and that the 2009 AMR order "directed DEO to deploy the [AMR] devices in a manner that would maximize

* * * savings by allowing rerouting at the earliest possible time." *Id*. at 17-18. The commission further interpreted its 2009 AMR order as setting forth the "expectation that DEO would reroute nearly all of its communities by the end of 2011." *Id*. at 18. And because Dominion failed to reroute three service areas by the end of the year, Dominion did not comply with the mandates and directives in the 2009 AMR order. Finally, the commission determined that its staff's calculation was reasonable and quantifiable because it was based on "the actual number of meter readers and the reduction in the number of meter readers once the program is fully deployed, which was to be by the end of 2011." *Id*.

{¶ 21} Dominion filed a motion to stay the commission's order pending appeal and an application for rehearing. In a December 12, 2012 entry, the commission denied both requests. Dominion timely appealed to this court and filed a motion to stay the commission's order. On March 13, 2013, this court granted the stay and ordered that the rate in effect prior to the commission's underlying order—$0.57 per customer per month—remain the interim rate pending resolution of this appeal.

## II. Law and Analysis

### A. Proposition of law Nos. 1 and 2

{¶ 22} Dominion's proposition of law Nos. 1 and 2 are similar. In both propositions, Dominion finds fault with the commission's underlying order. Because the arguments overlap, we interpret proposition of law No. 1 as setting forth an evidentiary argument and proposition of law No. 2 as setting forth a reasonableness argument.

{¶ 23} In proposition of law No. 1, Dominion asserts that the commission's order lacks record support because the commission "took a path recommended by no one." We disagree. Although the order is confusing—as explained more fully below—the commission clearly intended to adopt its staff's recommendation. The commission's order reviews in detail how its staff

calculated its proposed reduction to Dominion's AMR charge, and the commission then expressly "adopt[ed] Staff's recommendation." The underlying order, Pub. Util. Comm. No. 11-5843-GA-RDR, 2012 Ohio PUC LEXIS 801, at 18. Thus, we cannot conclude that the commission took a path recommended by none of the parties in the case.

**{¶ 24}** However, we agree with Dominion that the path the commission ultimately took was unreasonable. R.C. 4903.13 provides that "[a] final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable." In proposition of law No. 2, Dominion argues that the commission held Dominion to one standard—completion of its AMR program by the end of 2011—but then penalized Dominion on the basis of a different standard—installation of AMR devices by August 2011 and completion of rerouting by October 2011. Dominion is correct. Throughout the underlying order, the commission repeats its position that "DEO's AMR program was approved for a five-year period ending December 31, 2011." *Id*. at 13. But if Dominion's deadline was the end of 2011, it was irrational and arbitrary for the commission to adopt its staff's recommended AMR charge. The staff's recommendation was based on an assumption that Dominion should have installed all AMR devices by *August 2011* and completed rerouting by the beginning of *October 2011*—which was three months earlier than the December 31, 2011 deadline. Thus, even if Dominion violated the commission's December 31, 2011 deadline—which it may have, as Dominion had 9,530 devices yet to install in 2012—the remedy for that violation was not the staff's calculation, which was based on a different (earlier) deadline. Accordingly, the commission's adoption of its staff's recommendation was not rationally tied to Dominion's alleged failure to meet the December 31, 2011 deadline.

**{¶ 25}** The commission argues, however, that the 2009 AMR order directed Dominion to complete the program *before* the deadline. According to the commission, the 2009 AMR order "made it clear that the Commission expected Dominion to reroute communities and deliver savings to customers at the 'earliest possible time,' " and because Dominion failed to comply with this directive, the commission was justified in reducing Dominion's proposed AMR charge. But again, the 2009 AMR order provided only the following:

> [T]he Commission finds that DEO should be installing the AMR devices such that savings will be maximized and rerouting will be made possible in all of the communities at the earliest possible time. Therefore, the Commission expects that DEO's filing in 2011, for recovery of 2010 costs, will reflect a substantially greater number of communities rerouted. The Commission anticipates that, by the end of 2011, it will be possible to reroute nearly all of DEO communities. To that end, the Commission finds that, in its 2011 filing, DEO should demonstrate how it will achieve the *installation of the devices on the remainder of its meters by the end of 2011*, while deploying the devices in a manner that will maximize savings by allowing rerouting at the earliest possible time.

(Emphasis added.) 2009 AMR order at 7.

**{¶ 26}** This dispute centers on the four sentences quoted above. The commission focuses on the first sentence, interpreting it as directing Dominion to install AMR devices in a manner to maximize savings and ensure rerouting at the earliest possible time. But the first sentence cannot be read in isolation and must be read in context with the other sentences in the paragraph.

**{¶ 27}** The second sentence begins with "therefore," which means that it was meant to further explain how Dominion was to comply with the first sentence. The second sentence, however, merely directed Dominion to ensure that its 2010 AMR-charge application "reflect a substantially greater number of communities rerouted." Presumably, Dominion complied with this directive, since the commission's staff and Dominion agreed to an appropriate AMR charge in the 2010 AMR proceeding.

**{¶ 28}** The third sentence expressed the commission's anticipation that by the end of 2011, it would be possible to reroute nearly all of Dominion's communities. In its merit brief, the commission argues that this sentence "was concerned about Dominion *actually* rerouting communities, not the mere possibility of rerouting." (Emphasis sic.) But that is not what the 2009 AMR order says, and the commission cannot substitute the word "actual" for "possible." *Compare Cleveland Elec. Illum. v. Cleveland*, 37 Ohio St.3d 50, 524 N.E.2d 441 (1988), paragraph three of the syllabus ("In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used"). A plain reading of the third sentence indicates that the commission anticipated only that it would be possible to reroute nearly all service areas by the end of 2011.

**{¶ 29}** Finally, the fourth sentence of the paragraph directed Dominion to include a plan in the 2010 AMR-charge proceeding explaining how it would achieve installation of all AMR devices by the end of 2011, while rerouting at the earliest possible time. Dominion has conceded, and we agree, that this sentence could reasonably be interpreted as setting forth a target date of December 31, 2011, for completing *installation* of all AMR devices. But the sentence cannot be read as directing Dominion to complete *rerouting* by the end of 2011 because rerouting necessarily occurs after installation is mostly complete.

**{¶ 30}** The 2009 AMR order is so vague that it is difficult to summarize what, exactly, it directed Dominion to do—other than to submit additional information in Dominion's next AMR-charge application and aim to complete AMR installations by the end of 2011. Nothing in the 2009 AMR order clearly put Dominion on notice that it was required to complete its AMR program by the end of 2011. And certainly nothing in the 2009 AMR order instructed Dominion to maintain its 2009 AMR installation pace in order to complete installation of AMR devices by August 2011 and fully reroute all service areas by October 2011—which is how the staff calculated its recommended AMR charge in this case. Ultimately, if the 2009 AMR order were intended to speed up the program's deadline, the commission should have made its instructions clear and explicit. Instead, the commission relies on a strained interpretation of the 2009 AMR order to justify its staff's calculation, which was based on a program deadline that neither the commission nor its staff had previously set or announced to Dominion. Thus, it was substantively unreasonable for the commission to adopt its staff's recommended AMR charge.

**{¶ 31}** Finally, the commission argues that we should defer to the agency's interpretation of one of its own prior orders. But no deference is necessary when an agency has set forth an interpretation of a prior order that is contrary to the order's express terms. Accordingly, we find Dominion's second proposition of law well taken.

### B. Dominion's remaining propositions of law

**{¶ 32}** In proposition of law No. 3, Dominion asserts that the commission's underlying order effectively revised the installation and rerouting requirements set in the 2009 AMR order and that the commission lacked statutory and constitutional authority to take this retroactive action. However, we find that it is more accurate to conclude that the commission unreasonably interpreted its prior order rather than to find that it effectively revised that order. Our holding

not only reflects what actually occurred in this case but also avoids the constitutional issues regarding retroactivity raised in Dominion's brief. *See, e.g., State ex rel. Essig v. Blackwell*, 103 Ohio St.3d 481, 2004-Ohio-5586, 817 N.E.2d 5, ¶ 34, quoting *State ex rel. DeBrosse v. Cool*, 87 Ohio St.3d 1, 7, 716 N.E.2d 1114 (1999) (" 'courts decide constitutional issues only when absolutely necessary' "). Accordingly, because we have already decided that the commission's order was unreasonable, it is not necessary for us to decide this issue.

{¶ 33} In proposition of law No. 4, Dominion claims that the commission's order was barred by collateral estoppel. Specifically, Dominion argues that the issues of the target completion date for AMR installation and rerouting were decided in the 2009 AMR order, from which no party appealed. Therefore, the underlying order's "revisions" of the 2009 AMR order amounted to relitigation of those two issues, which violated the doctrine of collateral estoppel. Collateral estoppel, however, "applies when the fact or issue * * * was actually and directly litigated in the prior action." *Thompson v. Wing*, 70 Ohio St.3d 176, 183, 637 N.E.2d 917 (1994). Because we do not interpret the 2009 AMR order as setting forth clear program deadlines, we cannot conclude that those issues were "actually and directly litigated" in the 2009 AMR proceeding. When an issue is not actually litigated and decided in the previous proceeding, collateral estoppel cannot apply. *Id.* Accordingly, we reject proposition of law No. 4.

{¶ 34} Finally, in Dominion's proposition of law No. 5, Dominion argues that the commission erred in denying Dominion's motion to stay the commission's order pending its appeal. Specifically, Dominion asserts that the commission applied the incorrect legal standard in denying its motion, and it requests that we "reverse the Commission's denial of the stay, with instructions to apply the proper standard going forward." Dominion, however, also filed a motion for stay in this court, and we granted Dominion's motion in March 2013.

Given that the commission's order has since been stayed, Dominion has failed to identify an effective remedy for the commission's alleged error, other than this court's instructing the commission on the proper legal standard on a "going forward" basis. We decline Dominion's invitation to issue an advisory ruling, and because there does not appear to be an effective remedy here, we reject this proposition of law. *See, e.g.*, *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 17 (dismissing appeal where "[i]n the absence of the possibility of an effective remedy, [the] appeal constitute[d] only a request for an advisory ruling from the court").

### III. Conclusion

{¶ 35} The commission's order was unreasonable. The commission's adoption of its staff's recommended reduction to Dominion's AMR charge was not rationally tied to Dominion's alleged failure to meet the December 31, 2011 deadline, because the staff's calculation was based on Dominion's failure to meet earlier—and previously unknown—deadlines. And contrary to the commission's position, the 2009 AMR order cannot be reasonably interpreted as instructing Dominion to complete its AMR program months before the program deadline.

{¶ 36} For the foregoing reasons, we reverse in part, affirm in part, and remand this case to the commission for further proceedings consistent with this opinion.

Order affirmed in part
and reversed in part,
and cause remanded.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Whitt Sturtevant, L.L.P., Mark A. Whitt, and Andrew J. Campbell, for appellant.

Michael DeWine, Attorney General, and William L. Wright, Devin D. Parram, and Thomas G. Lindgren, Assistant Attorneys General, for appellee.

Bruce J. Weston and Joseph P. Serio, urging affirmance for amicus curiae, Ohio Consumers' Counsel.

_____